LOGAN PLANING MILL COMPANY, *a Corporation, v.*
WALTER POPE, JR.

(No. 9428)

Submitted September 7, 1943. Decided November 30, 1943.

322

*Grover C. Worrell,* for appellant.
*Bailey & Shannon,* for appellee.

KENNA, JUDGE:

In order to enlarge and retroactively enforce a deed of trust securing the cost of material furnished by it to John Brown to build a house in Oceana Junction, Logan Planing Mill Company brought this proceeding, seeking by mandatory injunction to compel the defendant to move onto the trust property, which it had purchased at a foreclosure sale, a house built from the material and alleged to have been fraudulently located, not on the trust property where the owner thereof and plaintiff had agreed it should be put, but upon an adjoining lot belonging to defendant which was not covered by plaintiff's lien and, therefore, not included in its foreclosure purchase. The final decree of the Circuit Court of Wyoming County impressed a lien for the amount claimed upon the dwelling and the lot of the defendant upon which it stands. This appeal was granted upon the petition of the defendant, Walter Pope.

The controversy was occasioned by the fact that the deed of trust to secure a note for the cost of the material of which the house was built was executed before the construction of the building was started, the plaintiff relying upon an understanding that it would be placed upon the vacant lots covered by its deed of trust. This was not done, but instead it was built upon the next lot, owned by the defendant who was then employed by plaintiff, the payee of the note secured.

The case on its merits involves the question of whether the dwelling was placed upon a lot owned by another by honest mistake of its builder and owner, unknown to the owner of the real estate, and consequently attached to the land so that it could not be lawfully removed without the permission of the landowner, or whether the dwelling was placed upon the wrong lot because of intentionally false information as to boundaries given the builder by the owner of that lot. There is some proof tending to show that the house was misplaced as the result of a fraudulent agreement between Pope, the owner of the lot where the dwelling was actually placed, and Brown, the builder of the dwelling, in order to avoid the effect of the existing deed of trust upon the adjoining property belonging to Brown given to secure the cost of the building material used in the construction of the house. The trial chancellor took the view that the record showed the fraud of defendant, the owner of Lot Fourteen, as the result of which the house was built upon his property. It does not appear whether John Brown was found to have participated in the fraud.

The final decree ordered that for the cost of the building material supplied by the plaintiff a lien should be impressed upon the dwelling and the lot where it stood, being the lot adjoining the two lots covered by the plaintiff's deed of trust, under which, at the time this cause was instituted, there had been a sale and purchase by the plaintiff. It was further ordered that unless the lien created by the decree was discharged within a prescribed

time the property should be sold in payment of the amount thereby secured.

In the year 1939 and a few years prior thereto Walter Pope was employed by Logan Planing Mill Company as the general manager of a branch office and plant of that company located at Oceana Junction, Wyoming County. The business of the company that employed him was to supply building materials of all kinds and to "process" the cost by taking a first lien by deed of trust securing installment payments to be made monthly and transferring the deed of trust and the indebtedness thereby secured to Allied Building Credits, Inc., guaranteeing payment. In addition to supervising the business of the Logan Planing Mill Company at and about Oceana Junction, Walter Pope had become generally interested on his own account in the local real estate business, purchasing property and reselling it to persons wishing to improve it, Pope being in a position to render them material assistance through the company by whom he was employed in financing the cost of construction.

In October, 1939, Pope purchased and had conveyed to him several acres of hill land in Oceana Junction and immediately caused it to be subdivided into thirty-nine town lots, calling them Pope's Addition. On November the fifteenth, before acquiring title to two lots in this addition, John Brown applied to the Logan Planing Mill Company for a loan of thirteen hundred dollars to be secured by a first lien by way of deed of trust on Lots Fifteen and Sixteen of the Pope Addition. The lots were entirely unimproved and, in that condition, their value did not exceed two hundred dollars. Apparently this application was approved by Pope acting on behalf of Logan Planing Mill Company as its local agent, forwarded to its main office at Logan, and from there sent to Allied Building Credits, Inc. In any event, on December 6, 1939, Walter Pope and wife conveyed Lots Fifteen and Sixteen to John Brown. On February 8, 1940, Brown and wife executed a deed of trust upon the lots Pope had conveyed to Brown

to secure Logan Planing Mill Company the payment of thirteen hundred dollars at the rate of twenty-one dollars and sixty-seven cents a month, naming C. S. Worrell as trustee. It would seem that Walter Pope at this time was in the Logan hospital and had been there for a few days suffering from spinal meningitis and that he was still ill in January, 1941, when he was at Hot Springs, Arkansas, for treatment.

In the latter part of February, 1940, Brown started the construction of the dwelling. Apparently the lots in Pope Addition were not staked and marked on the ground by number. At any rate it is not clearly shown where, as to lot number, Brown built the house. He did not testify, and the record is not clear concerning his purpose and whether the mislocation of the house was intentional or due to mistake when it was built or whether it was properly located when built and moved afterward. It is clear, however, that the house was not located entirely upon either Lot Fifteen or Lot Sixteen, that Brown had bought from Pope, when this case was begun. From a *pendente lite* survey it appears that with the exception of a corner that extended over the line between Lots Fourteen and Fifteen onto Lot Fifteen, it was then located entirely on Lot Fourteen, title to which remained in Walter Pope. Some witnesses indicate that Brown believed that he was buying from Pope two lots at the end of Second Street fronting on the property line of the Pope Addition which would have been Lots Fourteen and Fifteen. The deed to Brown called for Lots Fifteen and Sixteen, leaving the title to Fourteen between his property and the end of Second Street vested in Pope. Against this contention Brown's brother, who acted as superintendent in the construction of the dwelling, states positively that before commencing the building Brown knew certainly that it was not being constructed upon land owned by him, the clear inference being that his purpose was to evade subjecting his dwelling to the lien of the deed of trust which could then be done only with Pope's cooperation,

for, although still ill he at that time was frequently at and about his office from which that part of the Pope Addition upon which Brown was building was in plain view. The record does not show the exact date upon which the building was completed. Since it was a small frame building, it may be assumed that it was completed before the first of April, 1940.

On July 1, 1940, the employment of Pope by Logan Planing Mill Company was brought to an end, and almost immediately Pope organized and began operating the Christmas Lumber Company in direct competition with his former employer which had moved its local headquarters from Oceana Junction to Pineville. Pope was evidently still suffering but greatly improved.

The record does not show when John Brown left Oceana Junction, but it is quite evident that, after having purchased Lots Fifteen and Sixteen and after having built a small frame dwelling that was when he left located mainly on Lot Fourteen but extending over the line between Lots Fourteen and Fifteen onto Lot Fifteen at its eastern corner a distance of a few feet and having lived in the house for several months, he decamped without arranging a settlement of his indebtedness.

It seems quite evident that Brown disappeared in the winter of 1941. In April of that year Howard Currence took possession of the building as the tenant of Walter Pope. It will be remembered that at this time Logan Planing Mill Company had no representative in Oceana Junction, its branch establishment having been transferred to Pineville.

While Currence was still occupying the house in August, 1941, the Logan Planing Mill Company notified the trustee that payments were in default and to proceed to enforce the lien. The property was advertised, the sale being fixed for September fifteenth. The plaintiff contends that Walter Pope and his tenant, Howard Currence, a night or two before the sale undertook to move the house and did move it either entirely or partly from Lot

Fifteen onto Lot Fourteen. It does not appear from this record that the house was ever located entirely upon Lot Fifteen. To the contrary, the testimony indicates that it was constructed mainly upon Lot Fourteen with the deliberate purpose on the part of Pope of having it become his property, and possibly on the part of Brown of avoiding the effect of the deed of trust in so far as the value of the improvements was concerned.

There is a great deal of conflict in the testimony concerning the conduct of Pope and Currence as to the work that either did upon or near the dwelling in the middle of September, just before the sale under the deed of trust. Currence testified that the work he did was to overcome the effect of a landslide at the west or back of the house, admitting that he did several days work for Pope as a credit upon the amount of past due rent which he could not otherwise pay. The plaintiff introduced testimony tending to show that Currence and Pope were seen driving a truck containing block and tackle to the house, and were thereafter seen a night or two before the sale occurred attempting to move the house so that it would rest entirely upon Lot Fourteen.

On September 26, 1941, this proceeding was instituted, and in order to preserve the *status quo* the circuit court granted a temporary injunction, which on the same day was served upon Pope, the case being developed so that on July 22, 1942, the final decree was entered as stated, impressing a lien upon the dwelling and upon Lot Fourteen.

We are of the opinion, from the facts clearly established by this, in detail, rather confused proof, that at the time the house was constructed Walter Pope was employed by the plaintiff, and as a part of his duties he was supposed to supervise negotiations as the result of which plaintiff would be protected against loss for any credit advanced by a first lien taken upon the real estate improved with the material furnished by it. Certainly this was a position of trust and confidence not in the least

minimized, but to the contrary greatly accentuated, by the fact that Pope was also engaged in the sale of unimproved town lots to persons who desired to build and required the advancement of credit for that purpose. Means of performing that duty, in spite of Pope's illness, were plainly at Pope's disposal with the result that his failure to do so to the harm of his employer and his own benefit creates the clear inference of intentional fraud. The house that Brown built, was placed upon a lot owned by Pope under circumstances that justified the trial chancellor in concluding it was done with Pope's full knowledge. This being so, we believe that under the clear weight of authority the building itself, legal title to part of which had vested in Pope who held title to the land upon which it was partially placed, is clearly chargeable with a constructive trust to secure the cost of the building material to the company which delivered it with the understanding that it was to be used upon land upon which it already held a first lien. It follows that a trust impressed upon the building must necessarily apply also to sufficient land of the wrongdoer to permit its proper enjoyment and thus prevent its becoming valueless. We think, according to the showing in this record, that this principle should be applied to Lot Fourteen. The same result would follow if it were shown that Pope had participated in moving the house from Lot Fifteen to Lot Fourteen.

But the final decree did not impress the building and the lot upon which it stands with a constructive trust. Instead it impressed a lien upon the property in controversy and ordered its sale in satisfaction unless the amount so secured should be paid within a stated period. This, we think, was error. Subject to one well known exception, real property should not be ordered sold in order to satisfy a lien thereon without first ascertaining the amount and dignity of the various liens with which it may be charged. If the bill alleges and the decree can show as a matter of fact that the lien or liens for the satisfaction of which the land is ordered sold is the sole lien or the only liens

upon the property, no reference is necessary. Viewing this as a proceeding to subject real estate to the enforcement of a lien, the decree does not comply with the required procedure. In this case there was no such inquiry.

But this case should not be treated as a proceeding to subject real property to a lien. It is an attack upon the nature of the defendant's title to the improvement, by far the greatest element of value in the premises. We must remember that a lien does not impair a good title, but constitutes a charge against the lien debtor's interest *based upon good title*. That situation did not exist in this case. Here Pope's legal title to the house was obtained by fraud and since title to the house became intermingled with his title to the land upon which the house stood, the title to the whole became tainted and subject to attack. The defendant's title became impregnated with the equitable interest of the plaintiff in a manner that is to be distinguished from a separable incumbrance. Many matters may demand consideration before the possible conflicting interests in the property in question can be properly adjudicated and this can best be done under the administration of a court in chancery. Many similar situations have been encountered and that fact led to what has become known as the constructive trust doctrine, under which the legal title to property fraudulently acquired is held subject to the equitable interest of the rightful owner. *Avery* v. *Stewart*, 136 N. C. 426, 48 S. E. 775, 68 L. R. A. 776; 3 Bogert on Trusts and Trustees, 1453. We are of the opinion that this case distinctly lends itself to that form of relief, and not to the enforcement of the plaintiff's claim as a lien.

Having reached the conclusion that the facts shown by the evidence established a constructive trust upon Lot Fourteen in favor of Logan Planing Mill Company, we then are confronted by the question of whether John Brown is a necessary party. Plaintiff's position is that the deed of trust on Lots Fifteen and Sixteen having been enforced and title having passed to Logan Planing

Mill Company, Brown no longer held an interest that made him a necessary party. That may be true concerning Brown's interest in the lots described in and covered by the deed of trust. But it is admitted that he had purchased the material found in the house on Lot Fourteen and that he owed the plaintiff a substantial sum therefor. His possible equity may be negligible, but the foreclosure under the deed of trust does not prevent Brown from contesting the validity of plaintiff's claim in this proceeding and, in any event, he must be accorded the opportunity to protect any interest he may have in the property to be administered. We are of the opinion that he is a necessary party defendant.

For the foregoing reasons the decree of the Circuit Court of Wyoming County is reversed and the cause remanded for further development, leave to be granted plaintiff to amend its bill of complaint so that it will conform to the decision of this Court.

*Reversed and remanded.*